### In re BRODERBUND/LEARNING COMPANY SECURITIES LITIGATION,

Warren WOLFE; Rosalie Wolfe; the Charles E. and Alice S. Carlston Revocable Trust; Karen Markel; Melissa Nadler; Linda Frankish, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

Mattel, Inc.; Michael J. Perik; R. Scott Murray; Kevin O'Leary; Lamar Alexander; Michael A. Bell; Robert Gagnon; Carolynn N. Reid-wallace; Robert A. Rubinoff; Scott M. Sperling; Anthony J. Dinovi; Mark E. Nunnelly; Paul J. Zepf, Defendants–Appellees.

No. 01–56045.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 2002.

Filed June 28, 2002.

**1202**

Solomon B. Cera, Gold Bennett Cera & Sidener, LLP, San Francisco, CA, for the plaintiffs-appellants.

John W. Spiegel, Munger, Tolles & Olson, LLP, Los Angeles, CA; John F. Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, for the defendants-appellees.

Before FERNANDEZ, WARDLAW, and W. FLETCHER, Circuit Judges.

## OPINION

FERNANDEZ, Circuit Judge

Warren Wolfe and others (collectively Wolfe) brought this action against various officers and directors of The Learning Company, Inc. (TLC), and Mattel, Inc., which is TLC's successor in interest. The district court dismissed on the basis that Wolfe had not suffered any damages within the meaning of §§ 11 and 12 of the Securities Act of 1933,[1] 15 U.S.C. §§ 77k and 77 *l.* Wolfe appealed, and we affirm.

## BACKGROUND

Wolfe was a shareholder in Broderbund Software, Inc., which was acquired by TLC on August 31, 1998, at a time when TLC's stock was valued at $17.6875 per share. Broderbund shareholders received .8 of a share of TLC for each Broderbund share held by them on that date. For present purposes, however, the transfer ratio is not important; what is important is the fact that TLC stock was acquired at $17.6875 per share.

Before its merger with Broderbund, TLC had merged with another company and had filed a registration statement with the Securities and Exchange Commission, in which TLC allocated the purchase price in various ways. Thereafter, TLC had consultations with the SEC and determined that it should make changes in that statement, which it did in March of 1999. Its announcement of the changes had no

---

**1.** Hereafter referred to as the Act.

apparent effect on the market price of TLC stock. Still, Wolfe points to that and other alleged misstatements about TLC's financial condition as factors that caused TLC's market value to be higher than it should have been.

At any rate, TLC, itself, was acquired by Mattel on May 13, 1999, and upon that acquisition Wolfe received $33.45 worth of Mattel stock for each share of TLC stock, that is, $15.7625 per share more than what he paid for it. The value of the Mattel stock was determined by a formula that keyed on "the average of the closing prices of the Mattel common stock on the New York Stock Exchange for 10 randomly selected trading days out of the 20 trading days ending on the fifth trading day preceding the merger." Over the months following Mattel's acquisition of TLC, the price of Mattel stock fell to under $14 per share, and that, in turn, precipitated this action pursuant to §§ 11, 12 and 15 of the Act, 15 U.S.C. §§ 77k, 77 *l*, and 77o. The district court determined that Wolfe could not show damages within the meaning of those sections and, therefore, could not spell out a claim. Thus, it dismissed the action with prejudice. *See* Fed.R.Civ.P. § 12(b)(6). This appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 15 U.S.C. § 77v and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review de novo an order granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Wyler Summit P'ship v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661 (9th Cir.1998). In so doing, we accept as true all material allegations of the complaint and construe them in the light most favorable to the

plaintiffs. *See Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996). Moreover, a dismissal without leave to amend is not appropriate unless the district court " 'determines that the pleading could not possibly be cured by the allegation of other facts.' " *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000) (en banc) (citation omitted).

## DISCUSSION

■ Did Wolfe suffer damages within the meaning of § 11 or § 12 of the Act, despite the fact that he acquired TLC stock at $17.6875 per share and disposed of it in a merger less than a year later at $33.45 per share? The district court correctly said no, as we shall demonstrate.[2]

### A. *Section 11 (15 U.S.C. § 77k)*

The Act provides that a person who acquires a security may sue when a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 11(a) (15 U.S.C. § 77k(a)). It goes on to provide that:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit....

Section 11(e) (15 U.S.C. § 77k(e)). Not surprisingly, we have read this as indicating that a person may sue for "losses caused by the misstatement or omission." *Hertzberg v. Dignity Partners*, 191 F.3d

---

**2.** Section 15 of the Act requires no separate consideration. It would merely provide for joint and several liability, if we found liability in the first place.

1076, 1079 (9th Cir.1999). Similarly, we have stated that damages must be "measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed." *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407, 1421 (9th Cir.1994). The logical question, then, is how Wolfe's $15.7625 gain per share can be a loss.

Wolfe says it is a loss because, even though the TLC stock was exchanged for Mattel stock, he did not really dispose of the TLC stock, and it continued to have some kind of existence right up to the date this action was filed. Thus, says he, the measure of damages should be in accord with § 77k(e)(1), that is, the stock's price on the date this action was brought.

But, in fact, neither TLC nor its stock continued to exist after the merger took place. TLC has simply disappeared. *See* 2 Henry W. Ballantine & Graham L. Sterling, *California Corporation Laws* § 252.03, at 12–10, 12–12 (4th ed.2002); Harry G. Henn & John R. Alexander, *Laws of Corporations*, § 346 (3d ed.1983). It has no continuing existence whatsoever. *See Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir. 1988). Nor does the stock itself continue to exist—it has been extinguished. *See Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 944 (7th Cir.1986).

And if we were to declare that even though the stock has disappeared it still lingers on in some phantom form, what would be the mystical value of that revenant security? Nobody can really tell; the most we know is the price of Mattel stock. In fine, 77k(e)(1) cannot apply to people who no longer held TLC stock on the date that this action was filed. By then Wolfe had disposed of his TLC stock,[3] and it no longer existed at all, either in his hands or otherwise. *See Versyss Inc. v. Coopers & Lybrand*, 982 F.2d 653, 655 (1st Cir.1992); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1262 (N.D.Cal.2000).

Because Wolfe had disposed of his stock, it seems logical to apply § 77k(e)(2), and when we do so it becomes apparent that there was no loss whatsoever; rather, there was a tremendous gain. But, says Wolfe, § 77k(e)(2) cannot be used because the stock was disposed of upon a merger rather than "in the market." Wolfe insists that "in the market" must mean a formal securities exchange, such as the New York Stock Exchange, and that any sale off of an exchange is, perforce, excluded from consideration under § 77k(e)(2). We see no justification for taking so restrictive a view of "in the market." While it can, no doubt, refer to a formal securities exchange, it can also refer to "a sphere within which price-making forces operate," as well as many other things. Webster's Third New International Dictionary 1383 (1986).

In context, it would seem middling strange if Congress intended to deny relief as to every transaction that was not actually made through use of the processes of a formal securities exchange. We need not, however, consider what the rule should be when, somehow, a publicly traded security is actually disposed of in a transaction in which the price is not essentially controlled by the prices generated by the invisible hand of a formal securities exchange. At the very least, the merger transaction in question here took place in a sphere where security exchange market forces were operating.

This merger was between two companies whose securities were traded on the New York Stock Exchange. Moreover,

---

**3.** It would be fair to say that for securities law purposes the stock was actually sold. *See* 17 C.F.R. § 230.145. However, the significant point, as we see it, is that, sold or not, it was disposed of.

the merger price was fixed by reference to the values generated by the price-making forces of that exchange. That is to say, for all practical purposes the parties were operating in the market, even though the actual transfer of shares did not pass from one hand to another through the procedural mechanisms of the security exchange itself. In short, Wolfe's stock was "disposed of in the market" at $33.45 per share, and he achieved a gain rather than a loss.

B. *Section 12 of the Act (15 U.S.C. § 77l)*

■ Section 12 of the Act provides that a person who sells a security through use of material misstatements or omissions:

> shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77 *l* (a)(2). Here again, there can be no recovery unless the purchaser has suffered a loss. That is to say, what the purchaser is entitled to is "a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Randall v. Loftsgaarden,* 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986) (citation omitted).

Here, Wolfe did dispose of his TLC stock. It was by merger, but it did amount to a sale of the security within the meaning of the Court's statement in *Randall. See* 17 C.F.R. § 230.145. Certainly, it cannot be said that Wolfe "owns the security" at this time. And when he disposed of it, he did so for an amount greater than the purchase price. That he suffered a later loss on his Mattel stock is beside the point. In the TLC transactions,

he "has suffered no damages recoverable under § 12(2)" of the Act. *PPM Am., Inc. v. Marriott Corp.,* 853 F.Supp. 860, 876 (D.Md.1994).

## CONCLUSION

Wolfe acquired TLC stock at $17.6875 per share and disposed of it at $33.45 per share. He now sues Mattel and TLC's officers and directors because of alleged improprieties at and before the date of his acquisition of the TLC stock. By use of rather vermiculate logic, he now attempts to change his $15.7625 per share gain into a loss. The perspicacious district judge was not persuaded that gain is loss. Nor are we.

AFFIRMED.